# United States District Court

_____ MIDDLE _____ DISTRICT OF _____ ALABAMA _____

In the Matter of the Search of
(Name, address or brief description of person, property or premises to be searched)

16900 Vaughn Road
Cecil, Alabama
(See Attachment A)

## APPLICATION AND AFFIDAVIT
## FOR SEARCH WARRANT

CASE NUMBER: *2:07mj 78-WC*

I _____ SA Neill Thompson _____ being duly sworn depose and say:

I am a(n) _____ Special Agent, Drug Enforcement Administration _____ and have reason to believe
                                    Official Title

that ☐ on the person of or ☒ on the property or premises known as (name, description and/or location)

16900 Vaughn Road
Cecil, Alabama
(See Attachment A)

in the _____ MIDDLE _____ District of _____ ALABAMA _____

there is now concealed a certain person or property, namely (describe the person or property to be seized)

See Attachment B

which is (state one or more bases for search and seizure set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)

property that constitutes the fruits, evidence, and instrumentalities of a crimes against the United States,

concerning a violation of Title _21_ United States Code, Section(s) _841(a)(1) & 846_.

The facts to support a finding of Probable Cause are as follows:

See Attached Affidavit hereby incorporated by reference as if fully restated herein.

Continued on the attached sheet and made a part hereof.    ☒ Yes    ☐ No

Signature of Affiant

Sworn to before me, and subscribed in my presence

_____ 8-15-2007 _____    at    _____ Montgomery, Alabama _____
Date                                          City and State

Wallace Capel, Jr.
United States Magistrate Judge
_____    _____
Name and Title of Judicial Officer                Signature of Judicial Officer

A F F I D A V I T

Neill Thompson, having appeared before the undersigned United States Magistrate, and having been duly sworn, deposes and states:

I am a Special Agent with the Drug Enforcement Administration assigned to the Montgomery District Office. I have been a DEA Agent since June 1998. Prior to June 1998, I was a police officer with the Tuscaloosa Police Department for a period of approximately twelve years, with over four of those years as a narcotics detective. During the course of my career, I have written and executed in several search and seizure warrants for narcotics, dangerous drugs, records, books, and proceeds derived as a result of this illicit activity. Further, I have arrested many individuals for violations of State and Federal narcotics statutes. I have attended and successfully completed training concerning narcotics trafficking, conspiracies, and money laundering methods that narcotics traffickers employ. Through my training I have developed knowledge of how narcotic traffickers launder drug proceeds in violation of Title 31 USC Section 5313 and 5324 and under Title 18 USC Section 1956 and 1957.

This affidavit, which is based upon personal knowledge and knowledge obtained from other law enforcement officers, is submitted in support of an application for warrants to search the following properties and persons:

The residence and all out buildings at the premises, and vehicles located at 16900 Vaughn Road, Cecil, Alabama. Persons who reside at this residence: James Earl STINSON and Vivian

1

SIMMONS.

This application for search warrant to search the above mentioned properties and individuals is based on probable cause to believe that located therein or thereon is evidence related to narcotics offenses as described in Title 21, United States Code, Section 841 (a)(1), and 846.

As a result of my personal participation in this investigation, including reviewing the records and reports made available to me by other Special Agents from the Drug Enforcement Administration, I am familiar with the circumstances of the offenses described in the affidavit.

Facts and Circumstances Supporting Probable Cause:

This section is intended to provide an overview of the investigation and the organization that is the subject of this Application. Specific information and sources for your Affiant's knowledge of the facts and circumstances are provided in the text of this affidavit.

Since June 2004, the DEA Montgomery District Office has conducted an investigation concerning the drug trafficking activities of Cristobal GUTIERREZ and others in Texas and Alabama. This investigation has revealed the presence of a drug trafficking organization managed by GUTIRREZ that supplies quantities of marijuana and cocaine to individuals in Montgomery and Birmingham.

On June 1, 2007, GUTIERREZ was arrested by Special Agents assigned to the DEA Corpus Christi, Texas Resident Office. The arrest occurred subsequent to the seizure of approximately 300 pounds of marijuana from a tractor-trailer being driven by Javier

2

ORTEGA. ORTEGA was attempting to enter the United States at a border checkpoint. When ORTEGA was arrested, he told agents that he was transporting the marijuana for GUTIERREZ, and that he was to deliver the marijuana to a subject known only to him as "Shorty" in Montgomery, Alabama. ORTEGA agreed to cooperate and further the investigation. That day recorded telephone calls were made from ORTEGA to GUTIERREZ and a meeting was arranged in which GUTIERREZ gave ORTEGA money (supposedly for inspection stickers) and discussed the delivery of the marijuana. GUTIERREZ was arrested and also agreed to answer questions regarding the "load" of marijuana.

GUTIERREZ and ORTEGA both stated that the marijuana was destined to be delivered to Montgomery to a black male known only as "Shorty". ORTEGA said that he had transported two prior "loads" of marijuana to "Shorty" at "Shorty's" house located near County Road 110 and County Road 37. ORTEGA described "Shorty" and stated that "Shorty" owned a tow truck company named "Tri-City" towing. Additionally, ORTEGA stated that "Shorty's" wife's name was "Vivian", that "Vivian" had shot "Shorty" in the foot, and that "Shorty" was on probation for a marijuana charge. ORTEGA said that "Shorty" had several pit bulldogs which he used in illegal dogfights. ORTEGA also said that "Shorty" has several firearms.

ORTEGA agreed to place recorded telephone calls to "Shorty's" telephone using the "push-to-talk" (PTT) feature. On June 1, 2007 ORTEGA called PTT number 186*36*46195 and talked to a male he identified as "Shorty". ORTEGA told "Shorty" that he was postponed coming to Montgomery because of inspection certificates. ORTEGA asked "Shorty" what he was supposed to do with the "stuff" and "Shorty" told ORTEGA that was ORTEGA'S and

3

GUTIERREZ'S problem because "Shorty" was going out of town on vacation for two weeks. Based on my training and experience, I know that drug traffickers are often hesitant to talk freely on the phone for fear of law enforcement overhearing their conversations pursuant to a court authorized Title III wiretap. I believe that "Shorty" disavowed ownership in the marijuana for that reason.

As stated above, ORTEGA said that he delivered marijuana to "Shorty" on two prior occasions. The first delivery occurred in April 2007 and ORTEGA was told by GUTIERREZ that ORTEGA was delivering 60 pounds. The second delivery occurred in May 2007 and ORTEGA was told by GUTIERREZ that ORTEGA was transporting 60 to 70 pounds of marijuana. ORTEGA believes GUTIERREZ was consistently lying about the amount of marijuana ORTEGA was transporting to Alabama. ORTEGA stated GUTIERREZ told ORTEGA that ORTEGA was transporting 60 pounds of marijuana at the time of ORTEGA'S arrest. The actual amount was approximately 300 pounds of marijuana. Because GUTIERREZ lied about the amount of marijuana that ORTEGA was transporting on this trip, ORTEGA believes that GUTIERREZ lied about the amounts that ORTEGA transported of the two previous trips.

ORTEGA said that when ORTEGA got to "Shorty's" house with the marijuana, "Shorty" would walk out into the wooded area around his residence with a shovel and come back out of the wooded area with cash. ORTEGA said that "Shorty" said that he used tow trucks to make deliveries of marijuana around Montgomery, but that "Shorty" also delivers marijuana to Atlanta, Georgia and New York City, New York. ORTEGA said that "Shorty" and GUTIERREZ used a white male known only as "Jerry" to launder drug proceeds.

4

ORTEGA said that "Jerry" owns an automotive dealership in Mobile and "Shorty" buys cars under the direction of GUTIERREZ from "Jerry". ORTEGA said that GUTIERREZ then takes the cars to Mexico where he sells them. ORTEGA said taking cars instead of cash decreases the risk of having proceeds, especially cash, seized by law enforcement.

On July 30, 2007, DEA Special Agent Thomas Halasz and I went to the area of County Road 110 (Vaughn Road) and County Road 37 (Flowers Road) to attempt to locate "Shorty's" house. Based on the directions and description, we turned into the driveway located at 16900 Vaughn Road and drove to a wooden fence with an open gate. Past the gate we were able to observe several cars including a wrecker with "Tri-County Wrecker" printed on the side. We were able to record a license plate on a Pontiac Grand Prix parked in front of the house. The license plate, PIT1, is assigned to a 1997 Pontiac Grand Prix, registered to James STINSON at 256 Randall Road, Cecil, Alabama. The tag number also is most likely a reference to Pit Bulldogs.

SA Kenneth Koch of the DEA Corpus Christi Resident Office caused an Administrative Subpoena to be issued to Nextel Communications requesting that they provide subscriber information for PTT number 186*36*46195 (the number used for "Shorty's" telephone). Nextel Communications responded with the requested information. PTT number 186*36*46195 was assigned (on June 1, 2007) to a telephone issued to James STINSON at 256 Randall Road, Cecil, Alabama. Nextel Communications records also show that on June 4, 2007, an individual representing himself as STINSON requested that he be assigned a different telephone number. Nextel Communications complied with STINSON'S request and assigned a different number to the telephone, which is still subscribed to STINSON. Based on my

5

training and experience, I believe that STINSON changed his telephone number after it became obvious to STINSON that ORTEGA was not communicating with him any more. I further believe that, because ORTEGA was not communicating with STINSON any longer, STINSON assumed that ORTEGA had been arrested.

I ran a check through the Law Enforcement Tactical System (LETS) and found that STINSON has a current Alabama license issued in October 2005 and he provided an address of 256 Randall Road, Cecil, Alabama. STINSON'S description is consistent with the description ORTEGA provided for "Shorty". A check of STINSON'S criminal history shows that he has an arrest and conviction in 1994 for Failure to License a Pistol, an arrest and conviction in 1996 for Possession of Marijuana first Degree, an arrest and conviction in 1997 for Cruelty to Animals, an arrest and conviction in 1997 for Possession of Cocaine, and an arrest and conviction in 2006 for Possession of Marijuana First Degree, which he was placed on supervised probation.

I also spoke with Task Force Officer (TFO) Bruce Little, who is listed as a witness on the most recent case against STINSON. TFO Little stated that STINSON was arrested in Prattville, Alabama on July 21, 2005. STINSON was a passenger in a vehicle being driven by his wife, Vivian SIMMONS, and the vehicle was stopped for a traffic violation. The patrol officer noticed alcoholic beverages and STINSON and SIMMONS were arrested. A search of the truck resulted in the seizure of approximately 100 grams of marijuana from the trunk, along with a small quantity of cocaine. Approximately $4,500.00 was seized from STINSON'S pants pocket. Initially, STINSON stated that the money came from an engine that he sold. He later stated that the money came from some furniture that he sold. The

6

money was subsequently forfeited. STINSON was read Miranda rights, and he agreed to answer questions. STINSON said that he had been "messing with marijuana...trying to make a dollar or two". TFO Little asked STINSON how long he had been selling marijuana and STINSON said he got back into (selling) a year ago, but originally started selling marijuana about 15 years ago. STINSON and SIMMONS provided 256 Randall Road, Cecil, Alabama as their address.

The information from LETS also showed that STINSON has approximately 13 vehicles registered in his name. A check through Industrial Relations shows that STINSON has no reported income over the past several years.

An Administrative subpoena was issued to Dixie Electric Co-op, the utility company that provides power to residences in Cecil, Alabama. The subpoena requested that Dixie Electric supply the name of the current billed customer at 16900 Vaughn Road. Dixie Electric responded with the requested information. The current subscriber at 16900 Vaughn Road is James E. STINSON, who provided the same social security number as STINSON. I also caused an Administrative Subpoena to be issued to the City of Montgomery Water Works Authority. The subpoena requested that they supply the name of the current billed customer at 256 Randall Road. Montgomery Water Works responded with the requested information, which showed that no water service has existed at 256 Randall Road since January 2004. Based on my training and experience, I know that drug dealers often attempt to conceal their residences from law enforcement for fear that law enforcement may obtain a search warrant and find money, drugs or other evidence of drug dealing. I further believe that when STINSON cites 256 Randall Road as his address, he is attempting to conceal his actual address

7

of 16900 Vaughn Road from law enforcement. When STINSON was arrested in July 2005 and when he obtained a driver's license in October 2005 he provided the 256 Randall Road address as his address. In July 2005 and October 2005, 256 Randall Road did not have active water service.

On August 9, 2007 Special Agents Koch and Jeff Vincent showed ORTEGA a photographic "line-up" of several photographs including STINSON'S. ORTEGA positively identified STINSON'S photograph as "Shorty". ORTEGA and GUTIERREZ have been incarcerated since their arrests on June 1, 2007. ORTEGA said that GUTIERREZ had approached him in jail and asked him if he had said anything else (to law enforcement) about "Shorty". ORTEGA told GUTIERREZ that he had not talked to law enforcement. GUTIERREZ then told ORTEGA that was good, because "Shorty" owed him money.


Based on my training, experience, and participation in numerous investigations involving narcotics importation and distribution organizations and in financial investigations involving large amounts of controlled substances, currency and other monetary instruments, I know;

a. that large-scale narcotics traffickers commonly maintain on hand large amounts of U.S. Currency in order to maintain and finance their ongoing narcotics business; that these drug proceeds are normally kept at a location where the narcotics trafficker has ready access to the money (such as a residence);

b. that individuals engaged in narcotics trafficking and/or money laundering commonly maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other paper relating to the illegal distribution of controlled substances; that these same individuals commonly

8

"front" (provide on consignment) narcotics to their clients; that the aforementioned books, records, receipts, notes, ledgers, airline tickets, money orders, and other papers are maintained where the narcotics traffickers have ready access to them (such as at the narcotics traffickers residence);

     c. narcotics traffickers and those engaged in the laundering of money commonly maintain addresses or telephone numbers in books or papers which reflect names, addresses and/or telephone numbers for their associates in the trafficking organization;

     d. that narcotics traffickers utilize highly sophisticated organizations to conceal their illegal activities and invest large sums of money in the formation of companies or corporations to serve as front companies which serve to conceal their illegal narcotics trafficking activities;

     e. that these businesses, which outwardly appear to be legitimate, are the focal point of the illegal enterprise and are often the repository of the proceeds of narcotics trafficking, or assets obtained as a result of said trafficking;

     f. that the businesses intimately associated with narcotics traffickers conceal and maintain books, records and documents which have been created by individuals engaged in the narcotics trafficking and money laundering;

     g. that, in order to accomplish this concealment, narcotics traffickers frequently build "stash" places within their residences or businesses. That there are a number of publications available instructing where and how to build "stash" places. Copies of these types of publications have been found in the residences and businesses of narcotics traffickers;

     h. that it is common for persons involved in large-scale narcotics trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and or expenditure of

9

narcotics proceeds, such as: currency, financial instruments, precious metals and gemstones, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letter of credit, money orders, bank drafts, cashiers checks, safe deposit box keys and money wrappers. These items are maintained by the narcotics traffickers within their residences, businesses or other locations which they maintain dominion and control over;

     i.   that large scale narcotics traffickers often utilize electronic equipment such as computers, telex machines, facsimile machines, currency counting machines and telephone answering machines to generate, transfer, count, record and/or store the information described above; this electronic equipment is normally used and maintained in the narcotics traffickers residence, business or another location in which the narcotic trafficker maintains control.

     j. that when drug traffickers amass large proceeds from the sales of drugs that the drug traffickers attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers utilizing including but not limited to, domestic and international banks and their attendant services, securities brokers, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts, and otherwise legitimate businesses which generate large quantities of currency;

     k.  that the courts have recognized that the small and medium denominations of questionable currency, along with the manner in which the currency is handled, carried and concealed may establish probable cause that there is a substantial connection between the questionable currency and narcotics transactions;

     l.  that the Currency Transaction Report (CTR) (IRS form 4789), which is required to be

10

completed and filed with IRS by all financial institutions on every currency transaction which exceeds $10,000, causes tremendous problems for narcotics traffickers when they attempt to negotiate their illegal profits at a financial institution;

m.  that, in order to evade the filing of a CTR, narcotic traffickers often "structure" their currency transactions so that no one transaction exceeds $10,000 or they provide false or misleading information in an attempt to legitimize or conceal the source and/or ownership of the currency;  evidence of this "structuring" is commonly found in the narcotics trafficker's residence.

n. that narcotics traffickers at times become fearful that their extravagant spending habits will bring them under scrutiny by the Internal Revenue Service or other federal, state, or local agencies. In order to legitimize their spending, these traffickers file tax returns reporting income commensurate with the amount of money they have spent during the year, which they feel can be traced and documented by the government. The "source" of their income reported on these returns is usually falsely stated, misleading or generic in terms.  Retained copies of these returns are commonly kept by the traffickers in their residences and businesses.

Drug traffickers often maintain in their wallet, purse or pockets, telephone numbers of drug associates, safe deposit box keys, cash receipts of expenditures or other documents such as business cards, providing leads to the disposition of drug proceeds.  Therefore, it is requested that all aforementioned persons be searched for evidence of drug trafficking.

Drug traffickers are also known to use their vehicles to transport drugs, store drug

11

proceeds and store records relating to their drug activities, such as gasoline tickets revealing out of town trips. Therefore, it is requested that all vehicles on the aforementioned premises be searched for evidence of drug trafficking.

Based on the foregoing, your Affiant further believes that probable cause exists to believe that on the premises, property and persons described herein there is to be found fruits, evidence and instrumentalities of criminal offenses against the United States to include Title 18, Untied States Code, Section 1956 and Section 1957 and Title 31, United States Code, Section 5313 and Section 5324, as well as evidence, fruits, instrumentalities of violations of Title 21, United States Code, Section 841 and Section 846. Attachment B sets forth items to be seized as evidence of the aforesaid crimes.

FURTHER AFFIANT SAYETH NOT.

Neill Thompson
Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me this __15__ day of _August_ 2007, by Neill Thompson, Special Agent, Drug Enforcement Administration.

_____
UNITED STATES MAGISTRATE JUDGE

12

# Attachment A

# **ATTACHMENT A**

16900 Vaughn Road, Cecil, Alabama is located on
Vaughn Road (County Road 110) east of Flowers Road
(County Road 37). The driveway is marked with a
mailbox with the number "16900" on top. The
driveway is worn asphalt and leads to a gate. The
residence is a one story dwelling approximately 50
yards from the gate.







# Attachment B

## ATTACHMENT B

## PROPERTY TO BE SEIZED

(1)    Books, records, ledgers, and/or writings which record the receipt and/or distribution of controlled substances including marijuana as well as any other memoranda relating to the transportation, ordering, purchase, delivery and/or distribution of controlled substances, which writings and records are contraband as well as evidence;

(2)    Papers, tickets, notes, schedules, receipts, and other writings and objects including but not limited to gasoline receipts, air travel vouchers, and motel/hotel embossed articles, which do or tend to establish domestic and/or interstate travel in interstate commerce;

(3)    Addresses and/or telephone books and papers and other writings reflecting names, addresses, and/or telephone numbers as well as bills and paid receipts reflecting telephone toll records, any and all of which reflect the names, addresses, and telephone numbers of aliases or code names of both known and unknown co-conspirators in the above-described criminal activity, as well as other indicia of telephone usage and service including pay telephone usage which indicia includes, but is not limited to, telephone credit cards, large amounts of nickel, dime and/or quarter currency, and telephone paging devices which are carried on or about the persons to receive incoming notice or messages and which are activated by telephone usage;

(4)    Currency of the United States including paper and coin currency, also precious metals, jewelry, financial instruments, including but not limited to, negotiable commercial paper, and currency obtained, connected with and/or possessed to facilitate the financing of illicit drug trafficking;

(5)    Photographs and videotapes, in particular, photographs or videotapes of co-

conspirators, of assets, and/or of controlled substances, in particular, marijuana;

(6)    Safes, strong boxes, and/or other secure receptacles for the maintenance of valuable items and/or important documents including books, records, and other writings as well as United States currency as described above, and any keys or other evidence of the existence and usage of any lockers, safety deposit boxes or other secure receptacles situated elsewhere than at defendant property;

(7)    Articles of false identification;

(8)    Radio electronic equipment including but not limited to transceivers, receivers, scanners, antennae, RF detectors, walkie talkies, wireless transmitters as well as other electronics which are used ancillary to such equipment, including but not limited to, electrical calibration equipment, meters and test equipment;

(9)    Computers or other electronic devices which are capable of storing information, including, but not limited to computers, lap tops, floppy disks, cd roms, zip disks, hard drives, and personal data assistants (PDA).

(10)    Firearms;

(11)    Controlled substances, in particular, marijuana;

(12)    Paraphernalia for packaging, cutting, weighing, and distributing controlled substances, including but not limited to, scales, bags, pipes, and duct tape;

(13)    Any and all other material evidence of violations of Title 21, United States Code, Sections 841 (a) (1) and 846, together with fruits, instrumentalities and evidence of crimes at this time unknown.